**HENDERSON, Archie L.**

v.

**Norman CARLSON, Director, Bureau of Prisons O'Brien, Jerry, Warden, USP Leavenworth.**

**Appeal of Norman CARLSON and Jerry O'Brien.**

**No. 86–5270.**

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) Jan. 21, 1987.

Decided Feb. 27, 1987.

Rehearing and Rehearing En Banc Denied April 3, 1987.

---

James J. West, U.S. Atty., Albert R. Murray, Asst. U.S. Atty., Scranton, Pa.,

Sherree L. Sturgis, Asst. Regional Counsel, Philadelphia, Pa., for appellants.

George E. Schumacher, Federal Public Defender, James V. Wade, First Asst., Federal Public Defender, Harrisburg, Pa., for appellee.

Before GIBBONS, Chief Judge, WEIS, and HUNTER, Circuit Judges

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

This is an appeal from a decision of the United States District Court for the Middle District of Pennsylvania granting habeas corpus relief to Archie L. Henderson, an inmate at the United States Penitentiary at Lewisburg, Pennsylvania. In reaching its decision the district court held that 1) the fifth and fourteenth amendments require different standards of judicial review of inmate disciplinary proceedings, and that 2) a prison disciplinary committee may not consider any evidence derived from a confidential informant unless the accused prisoner is apprised of the specific facts from which the committee determines that the informant is reliable. For reasons discussed below, we will reverse the order of the district court.

## FACTS AND PROCEEDINGS BELOW

In April 1985, Henderson, who was then an inmate at the federal penitentiary at Leavenworth, Kansas, received a written notice from prison officials advising that he had been charged with a violation of prison rules, planning or attempting to introduce drugs into prison facilities. On May 3, 1985, a three member institution disciplinary committee ("IDC") conducted a hearing on the charges. At the hearing evidence was presented indicating that three confidential informants had identified Henderson as a participant in a plan to introduce drugs into the prison through the visiting room. The precise details of the informants' statements were not revealed at the hearing; however, the members of the IDC received an investigative report containing the names of the informants and a detailed summary of their statements.

The IDC did not disclose to Henderson the bulk of the investigative report for fear that full disclosure would jeopardize the safety of the informants. However, the undisclosed portions of the report led the IDC to conclude that the informants were reliable. Prison authorities also presented at the hearing evidence gathered through surveillance of Henderson's social visits, telephone calls and letters. This evidence showed that Henderson, a woman named "Dot," and various other people were engaged in a clandestine scheme involving packages from Miami and Missouri, but there was no concrete mention of drugs in any of the surveillance evidence. Based on the informants' statements and the surveillance evidence, the IDC found Henderson guilty of the charged offenses and imposed a penalty of forfeiture of 60 days of Statutory Good Time Credits and prohibited social visits for a period of one year.

After an unsuccessful appeal to the Warden pursuant to 28 C.F.R. § 541.19 (1986), Henderson filed an application for writ of habeas corpus in the United States District Court for the District of Columbia. Henderson was then transferred from the Leavenworth penitentiary to the Lewisburg penitentiary, and the District of Columbia Court, therefore, ordered that the petition be transferred to the Middle District of Pennsylvania.

█ The district court referred the petition to a magistrate. The magistrate first noted that under *Superintendent v. Hill*, 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985), the decision of a state prison disciplinary committee will withstand a fourteenth amendment due process challenge so long as the decision is supported by "some evidence." *Id.* at 457, 105 S.Ct. at 2775. The magistrate went on to hold, however, that challenges under the fifth amendment to federal prison disciplinary action should be reviewed under the higher "rational basis" standard. The magistrate reasoned that, "[t]he considerations of federalism which warrant restraint on the part of federal courts concerning state governmental affairs are absent in the case of a federal prison disciplinary

adjudication." Accordingly, he reviewed the IDC decision under the rational basis standard, which is applicable on review of decisions of the United States Parole Commission. *See Zannino v. Arnold,* 531 F.2d 687 (3d Cir.1976).

The magistrate then held that under our decision in *Helms v. Hewitt,* 655 F.2d 487 (3d Cir.1981), *rev'd on other grounds,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), he was constrained from reviewing *in camera* the undisclosed portions of the investigative report, which the IDC used in determining that the confidential informants were reliable. As a result, the magistrate determined that there was insufficient evidence of record from which one could assess the reliability of each informant. Accordingly, he discounted the informants' statements and concluded that the remaining evidence did not provide a rational basis for finding that Henderson committed the violations with which he was charged. The magistrate, therefore, recommended that the writ of habeas corpus be granted and that the Good Time Credit be reinstated.[1] The parties made no objections to the magistrate's report and the district court adopted it without comment.

This appeal followed. We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253 (1982).

## I

■ Before reaching the merits of this case, we first must determine whether appellants, officials of the United States Bureau of Prisons, waived their right to appeal by failing to make timely objections to the magistrate's report. The Federal Magistrates Act, 28 U.S.C. § 636 provides in pertinent part:

(C) The magistrate shall file his proposed findings and recommendations under subparagraph (B) with the court and a copy shall forthwith be mailed to all parties.

Within ten days after being served with a copy, any party may serve and file written objections to such proposed find-

ings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions.

28 U.S.C. § 636(b)(1)(C). This statutory provision neither precludes nor mandates a waiver of appellate review absent objections. Under our supervisory powers, we are, however, free to promulgate a rule of waiver for failure to make objections under § 636(b)(1)(C). *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). Indeed, seven other circuits have held that failure to lodge timely objections with the district court waives appellate review, both as to questions of law and findings of fact. *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir.1980); *McCarthy v. Manson,* 714 F.2d 234 (2d Cir.1983); *United States v. Schronce,* 727 F.2d 91 (4th Cir.), *cert. denied,* 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984); *United States v. Lewis,* 621 F.2d 1382 (5th Cir.1980), *cert. denied,* 450 U.S. 935, 101 S.Ct. 1400, 67 L.Ed.2d 370 (1981); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981); *Video Views, Inc. v. Studio 21, Ltd,* 797 F.2d 538 (7th Cir.1986); *Niehaus v. Kansas Bar Ass'n,* 793 F.2d 1159 (10th Cir.1986). However, three circuits have rejected such a waiver rule, at least as to the right to appeal questions of law. *Lorin Corp. v. Goto & Co.,* 700 F.2d 1202 (8th Cir.1983); *Britt v. Simi Valley Unified School District,* 708 F.2d 452 (9th Cir.1983); *Nettles v. Wainwright,* 677 F.2d 404 (Former 5th Cir. Unit B 1982). Because this appeal raises issues involving the interpretation of legal precepts, we will confine our inquiry to whether a failure to file objections under § 636(b)(1)(C) waives the right to appellate review of questions of law.

---

1. He did not recommend that visiting privileges be restored because such privileges are not pro-

tected interests under the due process clause. *Wallace v. Hutto,* 80 F.R.D. 739 (W.D.Va.1978).

Recently, in *Welch v. Heckler*, 808 F.2d 264, 266 (3d Cir.1986), we were invited to adopt the waiver rule,[2] we declined to do so, and we decline again today. We perceive a number of problems with a rule that conditions appellate review on the existence *vel non* of objections to a magistrate's report. Those circuits that have adopted the rule have already generated numerous exceptions to it. Some courts refuse to apply the rule when a *pro se* litigant files objections, though not within the ten day time period. *Cay v. Estelle*, 789 F.2d 318 (5th Cir.1986); *Patterson v. Mintzes*, 717 F.2d 284 (6th Cir.1983). Others find an exception where the magistrate fails to provide adequate notice of the existence of the rule.[3] *E.g.*, *United States v. Valencia-Copete*, 792 F.2d 4 (1st Cir.1986); *Walters*, 638 F.2d at 949. Another court has stated that a party who fails to object in the first instance can move the district court to reconsider its approval of the magistrate's report, *Park Motor Mart*, 616 F.2d at 605, and others have suggested that the rule does not apply if the result would be "plain error," *id.*, or "manifest injustice," *Nettles*, 677 F.2d at 410, or would "defeat the ends of justice." *Video Views*, 797 F.2d at 540. Thus, it is apparent that the waiver rule carries with it an entire body of equity jurisprudence with which we are trepid to get entangled.

■■■ Leaving to one side the baggage that the rule carries, we detect a more fundamental problem with the waiver rule. Whether or not objections are made to the magistrate's report, under § 636(b)(1)(C) the district court "may ac-

cept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." While this statutory provision may not require, in the absence of objections, the district court to review the magistrate's report before accepting it, *see*, *Arn*, 106 S.Ct. at 472–73, we believe that the better practice is for the district judge to afford some level of review to dispositive legal issues raised by the report.[4] "The authority—and the responsibility—to make an informed, final determination ... remains with the judge." *Mathews v. Weber*, 423 U.S. 261, 271, 96 S.Ct. 549, 554, 46 L.Ed.2d 483 (1976). Given this responsibility, it must be assumed that the normal practice of the district judge is to give some reasoned consideration to the magistrate's report before adopting it as the decision of the court. "When a district court does accept the Magistrate's report, that is a judicial act, and represents the district court's considered judgment." *Lorin Corp.*, 700 F.2d at 1206. Further, no appealable decision exists until that judicial act is performed. *Siers v. Morrash*, 700 F.2d 113 (3d Cir.1983). Under 28 U.S.C. § 1291, it is our duty to review "all final decisions of the district courts." The fact that a particular "final decision" is the product of the district court's reasoned consideration of the magistrate's report, instead of the court's *de novo* review of the law, does not provide us with a sufficiently strong justification to circumscribe our duties under § 1291. Therefore, the failure of a party to object to a magistrate's legal conclusions may result in the loss of

**2.** We have on other occasions referred to cases in which the waiver rule was adopted by other circuits. However, we have stopped short of adopting the rule ourselves. *See Grandison v. Moore*, 786 F.2d 146 (3d Cir.1986); *Goney v. Clark*, 749 F.2d 5 (3d Cir.1984); *Siers v. Morrash*, 700 F.2d 113 (3d Cir.1983). In *Grandison* we held that "failure to object within ten days is not a jurisdictional defect" and does not necessarily preclude further consideration in the district court. *Grandison*, 786 F.2d at 148. Today we consider whether a failure to object waives review in the court of appeals.

**3.** We note that in this case the magistrate gave no indication that a failure to object would constitute a waiver of appeal.

**4.** Indeed, according to the district court's order, the magistrate's report was adopted only after "independent review of the entire record and applicable law." *Henderson v. Carlson*, No. 85–1609 (M.D.Pa. Apr. 2, 1986). Thus, since the district court conducted a *de novo* review even though no objection was made, appellate review would arguably be proper even if we were to adopt a waiver rule. In other words, when the district court elects to exercise its power to review a magistrate's report *de novo*, a party's previous failure to object becomes irrelevant. *See Arn*, 106 S.Ct. at 476–77 (opinion of Stevens, J., dissenting).

the right to *de novo* review in the district court—but not in the loss of the statutory right to appellate review.

## II

We now must determine whether the district court applied the correct standard of review. As noted earlier, the district court applied the rational basis standard, which the court claimed was the standard mandated by the fifth amendment. We need not refer to the constitution, however, to determine the standard of review in this case. We need only look to prison regulations. Title 28 C.F.R. § 541.17(f) (1986) provides in part:

The IDC shall consider all evidence presented at the hearing and shall make a decision in accordance with the greater weight of the evidence and one which is supported by substantial evidence manifested in the record of the proceedings.

This regulation was promulgated pursuant to authority delegated by Congress to the Bureau of Prisons and the Attorney General. *See* 18 U.S.C. § 4042 (1982). It is, therefore, a "law of the United States" for purposes of the habeas corpus statute, *see* 28 U.S.C. § 2255 (1982); and *see United States v. Fuellhart*, 106 F. 911, 913 (C.C. W.D.Pa.1901) (holding that Treasury regulation is a law of the United States), *cf. Chasse v. Chasen*, 595 F.2d 59, 62 (1st Cir.1979) (for purposes of 28 U.S.C. § 1331(a) (1982), an agency regulation is a law of the United States if promulgated in a formal manner and pursuant to a statutory delegation of authority), and it is binding on all federal prison officials.

The "substantial evidence" standard mandated by the regulation is clearly higher than any standard that the Constitution imposes on prison disciplinary proceedings. *See Hill*, 472 U.S. at 457, 105 S.Ct. at 2775. Accordingly, the district court should have reviewed the IDC decision under the substantial evidence standard.

## III

We now turn to the question of whether the magistrate and district court erred by refusing to review *in camera* those portions of the investigative report that were not disclosed at the disciplinary hearing and that led the IDC to conclude that the confidential informants were reliable. In *Helms v. Hewitt, supra*, we held

... that when a prison tribunal's determination is derived from an unidentified informant, the procedures approved in *Gomes v. Travisono* must be followed to provide minimum due process.

"(1) [T]he record must contain some underlying factual information from which the [tribunal] can reasonably conclude that the informant was credible or his information reliable; (2) the record must contain the informant's statement [written or as reported] in language that is factual rather than conclusionary and must establish by its specificity that the informant spoke with personal knowledge of the matters contained in such statement."

*Helms*, 655 F.2d at 502 (quoting *Gomes v. Travisono*, 510 F.2d 537, 540 (1st Cir.1974)). Thus, as the magistrate recognized, the issue can be restated as "whether 'the record' within the meaning of the *Helms* rule is descriptive of the entire breadth of the disciplinary committee members' knowledge or, rather, of the body of testimony and evidence actually presented at the disciplinary hearing." *Henderson v. Carlson*, No. 85–1609, rep. of magistrate at 9 (M.D.Pa. Mar. 11, 1986). The magistrate and district court concluded that it is the latter. We disagree.

As noted above, we adopted the *Helms* rule from a set of Rhode Island prison regulations approved by the First Circuit in *Gomes v. Travisono*, 510 F.2d 537 (1st Cir.1974). Those regulations are reprinted in full in *Morris v. Travisono*, 310 F.Supp. 857, 865–75 (D.R.I.1970). The regulations make clear that "the record" includes not only the evidence presented at the disciplinary hearing but also the investigative report:

The disciplinary record shall include:

1. An appropriate summary of all information produced at a hearing *plus*

*the written summary investigation referred to ... above....*

*Id.* at 873 (emphasis added). Under the regulations and, therefore, under *Helms,* the IDC properly considered information in the investigative summary that was not disclosed at the hearing. This information is part of "the record" that the district court should have reviewed *in camera.*

■ In *Helms* our aim was to adopt a rule that would "provide minimum due process," 655 F.2d at 502, and our holding today—that a prison disciplinary committee need not reveal at a disciplinary hearing evidence bearing on the reliability of confidential informants if prison officials believe that such evidence is capable of revealing the identity of the informants and if the evidence is made available to the court for *in camera* review—is fully consistent with constitutional mandates. In *Baxter v. Palmigiano,* 425 U.S. 308, 322 n. 5, 96 S.Ct. 1551, 1560 n. 5, 47 L.Ed.2d 810 (1976), the Supreme Court squarely held that a prison disciplinary committee is not required to base its determination solely upon the evidence presented at the hearing, and on numerous occasions the Court has stated that an inmate's confrontation and cross-examination rights are subject to overriding considerations of prison order and to the sound discretion of prison officials. *Wolff v. McDonnell,* 418 U.S. 539, 567–69, 94 S.Ct. 2963, 2980–81, 41 L.Ed.2d 935 (1974); *Baxter,* 425 U.S. at 321–23, 96 S.Ct. at 1559–60; and *see Ponte v. Real,* 471 U.S. 491, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985) (iterating that the right to call witnesses is subject to the discretion of prison officials), and *Hughes v. Rowe,* 449 U.S. 5, 9 n. 6, 101 S.Ct. 173, 175 n. 6, 66 L.Ed.2d 163 (1980) (same). Further, in *Ponte v. Real,* the Court held that prison officials are not obligated to explain at the hearing why witnesses requested by the inmate are not allowed to testify, and even the dissenting Justices agreed that "sealed contemporaneous explanations followed by *in camera* review ... would satisfy [due process] concerns fully." 471 U.S. at 513, 105 S.Ct. at

2205 (Marshall, J., dissenting). Together, these cases confirm that our holding adequately accommodates inmates' procedural due process rights.[5]

■ We have reviewed *in camera* the confidential investigative report. After analyzing the confidential informants' testimony under the *Helms* test, we are satisfied that there is substantial, competent evidence of record supporting the IDC decision. Accordingly, the district court should not have granted the writ of habeas corpus, and we hereby reverse the action of the district court and deny the writ.

The public and prison officials have an enormous interest in avoiding prison disruption and "situations that may trigger deep emotions and that may scuttle the disciplinary process as a rehabilitation vehicle." *Wolff,* 418 U.S. at 568, 2980. Undoubtedly such situations would occur all too often if prison officials were not adequately equipped to safeguard the identities of confidential informants. "[P]rison disciplinary hearings take place in tightly controlled environments peopled by those who have been unable to conduct themselves properly in a free society. Many of these persons have scant regard for property, life, or rules of order ... and some might attempt to exploit the disciplinary process for their own ends." *Ponte,* 471 U.S. at 497, 105 S.Ct. at 2196. We hope that today's decision will help prevent such exploitation while preserving inmates' procedural entitlements.

GIBBONS, Chief Judge, dissenting:

I join in Part I of the opinion of the court, which holds that the officials of the Bureau of Prisons did not waive their right to appeal by failing to make timely objections to the Magistrate's Report. I also join in Part II, holding that we review federal prison disciplinary proceedings as a matter of federal law under the "substantial evidence" standard which the Bureau of Prisons adopted in 28 C.F.R. § 541.17(f)

---

**5.** Our decision is also supported by *Mendoza v. Miller,* 779 F.2d 1287 (7th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 2251, 90 L.Ed.2d 697

(1986), in which the Seventh Circuit reached a holding virtually identical to our holding today.

(1986), rather than by the lower "some evidence" test applicable, by virtue of the due process clause, to state prison disciplinary proceedings.[1] I also join in Part III, to the extent that it holds that the United States Magistrate erred in holding that when reviewing a Bureau of Prison's disciplinary determination, evaluation of the reliability of an informant must be made on the basis of the record disclosed to the disciplined inmates, without regard to *in camera* materials considered by the disciplinary tribunal. Thus, I agree that in exercising review of the disciplinary board's decision by habeas corpus or otherwise, we must take into account the contents of the *in camera* materials.

I part company with the majority, however, at paragraph 15. I do not agree that there is substantial evidence, even if we include the *in camera* materials, that Archie L. Henderson committed the offense with which he was charged. The incident report dated April 17, 1985, containing the charge, alleges that Henderson planned and attempted to introduce drugs into the prison through the visiting room in concert with fellow inmate Willie Strickland and certain female visitors. Henderson denied guilt and a hearing was held on May 3, 1985. Henderson called three witnesses, one of whom was Strickland, who denied that Henderson was involved in Strickland's drug smuggling activities. In finding that he was guilty of the charge, the Institution Discipline Committee relied on an investigatory report containing summaries of interviews with four confidential informants, excerpts from monitored phone calls by Henderson, guard observation reports, and excerpts from intercepted letters mailed by Henderson to Stephanie D. Taylor.

The Institution Discipline Committee found that, "based on the reliability and corroboration of the confidential informants along with telephonic intelligence and physical evidence", there was substantial evidence to indicate that Henderson committed the act as charged. The finding of guilt resulted in Henderson's loss of sixty days of statutory good time credit, suspension of all social visits for one year and suspension of visits by Stephanie Taylor for five years.

The investigatory report upon which the Institution Discipline Committee relied was reviewed *in camera* because it contains the identity of the confidential informants who supplied information to the investigator. Without revealing their identity, the information that they furnished is as follows:

1. Henderson was a member of a group of three inmates who in the past had received marijuana in bulk from a corrupt correctional officer (who was later arrested) and had distributed it for profit in the institution.

2. Thereafter Henderson was suspected of introducing drugs through the visiting room, of using his visitor Stephanie D. Taylor as a mule, and of distributing the drugs through Willie Strickland. The suspicion was based upon monitored telephone calls and letters referring to "our circle" and upon monitored calls referring to the receipt by potential visitors of two packages, one from Miami and another from Missouri. None of the telephone calls or letters mentioned drugs explicitly.

3. The suspected *modus operandi* of the drug smuggling operation was for the female visitor to conceal balloons containing the drugs in her mouth and transfer them to Henderson while kissing him, and for Henderson to swallow the balloons and later recover them after they passed through his body. The drugs would then be distributed through Strickland.

4. On November 8, 1984, following a visit by Stephanie D. Taylor, Henderson was placed in a dry cell in order to recover the balloons. A dry cell is one in which the inmate is observed and his excrement is

---

1. Because the Bureau of Prisons has adopted the same test—substantial evidence—that would be triggered if the Bureau is a federal agency within the meaning of the Administrative Procedure Act, 5 U.S.C. § 551(1) (1982), we need not consider that question. *Compare Ramer v. Saxbe,* 522 F.2d 695, 697 (D.C.Cir.1975) *with Clardy v. Levi,* 545 F.2d 1241, 1246 (9th Cir. 1976). We left the question open in *Allen v. Aytch,* 535 F.2d 817, 822 n. 23 (3d Cir.1976).

preserved. The dry cell operation was discontinued with negative results. Henderson remained under suspicion, however, because a confidential informant indicated that he "felt" that Henderson had "beat" the prison officials by successfully passing several balloons out of the dry cell during a period of momentary distraction of the dry cell officer. This "feeling" was not based upon any observation of the balloons being passed out of the cell nor upon any observation of such a distraction of the dry cell officer. No corroboration of the momentary distraction was furnished by the dry cell officer.

5. On March 16, 1985, Stephanie Taylor visited Henderson again. While she was there, Henderson placed some unidentified object in his mouth and drank a beverage. The visit was recorded by a closed-circuit camera which apparently was not shown to the Institution Discipline Committee. Henderson was again placed in a dry cell, and told a corrections officer that he would "hold out as long as he could" to force the institution to pay overtime for the dry cell operation. The dry cell operation was discontinued with negative results. The report again stated that "intelligence [unidentified] indicates that the possibility exists that inmate Henderson may have found an opportunity to again rid himself of any contraband while in the cell."

There is no other evidence, direct or circumstantial, first-hand or hearsay, that Henderson in fact introduced drugs into the institution through the visiting room in concert with Willie Strickland.

I am willing to assume *arguendo* that the Institution Discipline Committee could credit the informant information that Henderson was part of the marijuana distribution ring involving the corrupt correctional officer. I am willing to assume, as well, that the telephone calls and letters suggest possible membership in some kind of group. But these facts are not substantial evidence of the specific charge made. Marijuana is far too bulky a substance to be hidden in balloons and swallowed, on two occasions, in sufficient quantities to support a distribution scheme. Another drug might have been the object of the alleged scheme, although none is identified. Even if we credit the possibility that some other drug was placed in a balloon and swallowed, there is no evidence that Stephanie D. Taylor possessed such a drug. Assuming she did, and passed it to Henderson, it should have been recovered in the dry cell. No drugs were recovered on either occasion.

Thus, the sole evidence supporting the charge is the "feeling" of an unnamed informant that Henderson was able, on two occasions, to evacuate his bowels, recover a balloon or balloons, distract the dry cell officer, and pass the balloons unobserved, to some unidentified confederate. There is no corroboration by the dry cell officer of any such distraction or of the presence near the dry cell of any such confederate. Furthermore, there is no evidence of a linkage between the dry cell confederate and Willie Strickland.

We review many agency decisions under a substantial evidence standard. If we were asked to sustain a decision of the National Labor Relations Board or the Social Security Administration on evidence of the quality here involved, there would be no doubt of the outcome. The Bureau of Prisons has adopted the substantial evidence standard. It cannot do so, however, and expect us, in exercising our review function under that standard, to suspend our powers of reason. Whatever Henderson and Strickland were up to, there is no evidence that they were doing what Henderson was charged with. The speculation that some informant "felt" that the ingenious Mr. Henderson could swallow enough balloons full of drugs to support a distribution network, pass them unobserved while in a dry cell and then, while distracting the dry cell officer who was charged with observing him, pass them out of the dry cell is just that—mere speculation. It is not evidence at all.

Since there is no substantial evidence supporting the charge that Henderson introduced drugs through the visiting room in concert with Willie Strickland, I would affirm the order appealed from.